## No. 7723.

FREDERICK DAVIS, ADMINISTRATOR, ET AL. VS. GREVE & WILDERMAN ET AL.

Where, on an application for the appointment of an administrator, the question was whether a person who had disappeared from his home was dead or was merely an absentee, the parish judge, after hearing the proof, solemnly decided that he was dead, and appointed an administrator of his succession, such judgment cannot be questioned collaterally; and until it has been set aside other tribunals must assume that the person is dead.

Where more than thirty days elapsed between the making of a contract and the death of a party alleged to have been insane, the insanity cannot be shown, after his death to invalidate the contract unless interdiction shall have been applied for, except where the act or instrument contains, in itself, evidence of the insanity of the deceased.

Where the mortgagor holds by a title apparently legal and valid, which is properly inscribed in the public records, the mortgagee in good faith is not affected by fraud, or simulation, or want of consideration between the mortgagor and his vendor.

The good faith which the law requires and protects is that which exists at the time of contracting; and the rights of the mortgagee in good faith are not impaired by subsequent notice or knowledge of defects in the title of the mortgagor.

APPEAL from the Fifteenth Judicial District Court, parish of Lafourche. *Beattie*, J.

Moore & Badeaux for plaintiffs and appellees:

First—What the intimate friends of a deceased person said about his insanity is admissible to show the common fame and notoriety of the insanity. 6 A. 172.

Second—Where a deceased was notoriously insane to the knowledge of those dealing with him, contracts made with him will be held null, although interdiction has not been applied for. 12 A. 24, 624, 651; C. C. 396, 1781, 1788, 1766, 2439.

Third—One who alleges a sale made with an insane person, must show two things, 1st. payment of price, and 2d. a lucid interval. 12 R. 98; 10 A. 691; 6 A. 108; 4 L. 115; Domat's Civil Law, vol. 1, p. 187, § 225; Kent's Com. vol. ii, pp. 570, 571, 572, 573.

Fourth—Possessors in bad faith cannot by themselves, or by their assigns, acquire the property of an immovable by the prescription of ten years. C. C. 3478; 24 Howard 553; C. C. 3452; Merlin, Repertoire de Jurisprudence, vol. 24, p. 130; 3 A. 324, 536; 16 A. 130; 1 A. 440; 2 A. 443.

Fifth—Knowledge of the agent is knowledge of the principal. Story on Agency, 593; 1 A. 80; 2 A. 316; 14 A. 711.

E. W. Blake and Kennard, Howe & Prentiss for defendants and appellants:

First—An administrator cannot maintain a revocatory action, or represent heirs. C. C. 1988–89, 1993; 29 A. 513; 14 A. 611; 4 A. 495; 26 A. 607; 1 R. 525; 6 R. 20; 10 R. 387.

Second—The formal judgment of a court cannot be treated as a nullity. 29 A. 560.

Third—The position assumed by the defense is, that inasmuch as the acts of 11th April, 1863, are sought to be annulled as mere simulations, having been signed by Kees, who had not the capacity to contract, he being at the time *non compos mentis*, the plaintiffs must establish one of two things, in order to succeed: first, that Kees had been interdicted, or secondly, that his interdiction had been applied for at least thirty days before his death. C. C. 1788, par. 5. No other proof is admissible. This proof must be unequivocal, in order that plaintiffs may succeed in having these acts declared absolute nullities on that account.

Fourth—The delivery of an immovable is always considered as accompanying the public act by which it is transferred. C. C. 2479; 30 A. 968. This principle is strengthened in the case of Meegels, because of their residing on the property at the time of their purchase, and as both vendor and vendees were living together the law declares in such a case that possession follows title. 3 N. S. 337, 194, 349; 1 R. 41; 11 R. 533; 6 A. 710; 30 A. 968.

Fifth—Provided an actual consideration, no matter how inadequate, has been paid for the purchase of an alleged sale, the transaction is not a simulated one, though the act declares the price to have been paid cash. 30 A. 968.

Sixth—A party in possession is not bound to prove the reality of the sale attacked for simulation. 21 A. 647; Louque's Digest, page 232, S. 4.

Seventh—The presumption of law is always in favor of sanity and capacity to contract, and this presumption continues until destroyed by the presumption *juris et de jure*, the decree of interdiction. 31 A. 757.

As plaintiffs have failed to establish the insanity of Kees in the mode pointed out, then it follows, as a consequence, that there was no incapacity proven, and the acts are not absolutely null on that account. C. C. 403, 1788 ; 12 A. 624.

Eighth—Whoever claims that a sale is null because the price was not paid must prove the want of payment. 29 A. 607.

Ninth—A mortgagee or vendee dealing in good faith on the evidence of a good title in the vendor or mortgagor will be protected. 6 Cranch, 133 ; 11 L. 401 ; 29 A. 607 ; 14 A. 48.

If evicted they are entitled to what they have paid, and value of improvements they have put on the property. See also 8 N. S. 224 ; 9 L. 290 ; 13 L. 408 ; 13 L. 98 ; 4 A. 227, 282 ; 5 A. 44. Hennen, p. 1373, S. 1.

It would be idle to hold a mortgage without the right to urge its foreclosure. 31 A. 352.

Tenth—Prescription of one year.

This is covered by the law which declares " that actions to annul contracts for fraud must be brought within a year from the time the fraud is discovered." Hennen, p. 1213, S. 1.

Eleventh—Prescription of five years. This is covered by C. C. Art. 5342, relative to nullity and rescission of contracts, testaments, and other acts, and for reduction of excessive donations. 25 A. 98.

Twelfth—Prescription of ten years. This is covered by C. C. article 3442.

Thirteenth—The plaintiffs' demand is stale. 5 A. 140 ; 7 A. 555, 562, 648 ; 14 A. 317.

Fourteenth—Fraud is never presumed. It must be proved. Henn. Dig. vol. 1. pp. 525, 526 ; Story on Equity, § 190 ; 11 Peters, 295 ; 99 Pa. St. 257.

---

The opinion of the court was delivered by

MARR, J. Abraham Kees owned and resided upon a tract of land, on the Bayou Lafourche, near Lockport. He was a widower ; and his family consisted, from about 1859, of his daughter, Widow Davis, and her children ; his son-in-law, Edward Meegel, and his wife and son ; and Fritz Meegel, a cousin of Edward, who had just returned from California.

On the 11th April, 1863, by two acts under private signature, executed in presence of witnesses, Kees conveyed one half of his prop-

·erty to Edward Meegel, for $4000, cash, and the other half to Fritz Meegel, $3600, cash, as stated and acknowledged in the acts. Kees continued to reside on the place, as before, until the latter part of 1863, when he disappeared from his home. He was an old man, of about eighty years, feeble.in body and in mind ; and he was seen, for the last time, attempting to cross a lake in Terrebonne parish, in a small hunting pirogue, with the avowed intention of going to his home on the Lafourche. The wind was high, the lake was rough, the weather was freezing : the owner of the pirogue informed the family of the perilous voyage the old man had undertaken ; search was made immediately ; but nothing has been heard of him since. The pirogue was found, by the owner, about a year after, adrift on the lake ; and the probability is, either that Kees was drowned, or that he perished with cold.

The Meegels continued to reside on the place, until 1865, when Fritz died. Eugene W. Blake was appointed curator of the vacant succession ; and, by order of the probate court, the entire property of the succession, including the land acquired from Kees, was sold to pay debts ; and the whole was purchased by Edward Meegel. The final account of the curator was homologated, and he was discharged on the 30th August, 1877.

In March, 1869, Edward Meegel mortgaged his property to Greve .& Wilderman, to secure two notes representing accrued debt, amounting to $6945 11 ; and future advances not to exceed $3054 89 ; and, in April, 1871, he mortgaged the same property, to the same parties, to secure a note for $1096 26, representing the indebtedness which had accrued under the stipulation in the first mortgage for future advances. In April, 1875, Greve and Wilderman proceeded *via executiva,* on these notes and mortgages ; and, in due course, the property was sold and adjudicated to Greve & Wilderman, for less than half the amount due them.

In the meantime, in February, 1872, Charles G. Davis filed a petition in the parish court, alleging the disappearance of his grandfather, Kees, in November, 1863 ; and praying to be appointed administrator of his succession. The parish judge, on the theory that Kees was dead, appointed Davis administrator ; and in April, 1872, this administrator, and his mother, then wife of Usé, brought suit against Edward Meegel and the curator of the succession of Fritz Meegel to have annulled the notes of 11th April, 1863, and the property restored to the succession of Kees ; and to recover the rents and revenues, on the ground : 1 ; that Kees was *non compos mentis;* and that his insanity was well known to the Meegels, and was a fact of public notoriety : 2 ; that no consideration was paid by the Meegels. The case was put at issue ; and in December, 1872, Mrs. Meegel authorized and aided by her husband,

SUPREME COURT OF LOUISIANA,

Davis, Administrator, et al. vs. Greve & Wilderman et al.

Edward Meegel, brought suit to annul the appointment of Davis as administrator, and the entire mortuary proceedings on several grounds, one of which was that the death of Kees had not been established ; and in November, 1873, by judgment of the parish court, the former proceedings were annulled, on the ground that Kees was not dead ; but was, in legal contemplation, living and an absentee.

Soon after this judgment was rendered Edward Meegel filed the peremptory exception that Davis was not capable of standing in judgment in the suit brought by him and his mother, his appointment as administrator having been annulled. The district judge maintained this exception ; and dismissed the suit as to Davis, alone, leaving it pending as to Mrs. Usé. No further proceeding was had in the suit after this, judgment, 6th December, 1873.

In July, 1877, Frederick Davis, brother of Charles G. Davis, filed a petition in the parish court, asking that a day be appointed for hearing testimony touching the death of Kees ; and to be appointed administrator, in the event of a judgment declaring his death. The testimony established the facts already stated, making it more than probable that Kees did not survive the hazardous voyage, which a sane man would hardly have undertaken in so frail a boat. The parish judge decreed that he was dead, and appointed Frederick Davis administrator in September ; and in October, 1877, this suit was brought by this administrator and his mother, joined and authorized by her husband Rozémond Usé, to recover the property and the rents and revenues, on the same grounds as alleged in the former suit.

In the meantime Edward Meegel and his wife died ; and Knight had been appointed administrator of his succession. Knight in his capacity, Blake as curator of the succession of Fritz Meegel, Greve & Wilderman, and Robert Meegel were cited as defendants. Exception was taken to the capacity of Davis to stand in judgment ; and Blake specially excepted that he was no longer the representative of the succession of Fritz Meegel. The case was put at issue by the answers of the defendants ; and Greve & Wilderman set up title and possession under the executory proceedings. There were also pleas of prescription, calls. in warranty, and reconventional demands, which do not require special notice.

The district judge was of opinion that Davis had no capacity to stand in judgment : that the conveyances to Edward and Fritz Meegel, and all the subsequent dispositions of the property, were nullities, so far as Mrs. Usé is concerned, not because of the alleged insanity of Kees, but because of fraud and non-payment of the price : that Greve & Wilderman were in good faith as mortgagees, but that this could not avail them because they claimed title under a sale made after notice of the

defects in the title of their mortgagor : that as Kees had but two forced heirs, he could have disposed, gratuitously, of half his property ; and that Mrs. Usé was entitled to recover her virile share, one half of the *légitime* only. The judgment, accordingly, decreed Mrs. Usé to be the owner of one fourth of the property, and condemned Greve & Wilderman to pay her $250 a year for rent, from the 15th July, 1875, the date of the adjudication to them by the sheriff ; and it dismissed the demand of Davis, with reservation of the rights of the other heirs of Kees. Greve & Wilderman appealed ; and Davis and Mrs. Usé, in answer to the appeal pray that the judgment be so amended as to conform to the prayer of their petition.

The record is very voluminous, much of it consisting of the testimony of numerous witnesses called to prove the mental condition of Kees ; and the counsel on both sides have discussed, at considerable length, and with much ability and research, the several questions raised in the pleadings. We think the real controversy lies within a very narrow compass.

All the circumstances proven, indicate plainly that Kees is no longer living ; and that he perished in November, 1863. If he were still living, where could he have been wandering during the long years of his absence, in his extreme old age and helplessness ? But this is not an open question for us. The parish judge having jurisdiction, heard the evidence touching his death ; and on the proof adduced he solemnly decided that Kees was dead ; and appointed an administrator of his succession. No appeal has been taken, none can now be taken from that judgment ; and it cannot be questioned collaterally. Until that judgment is set aside other tribunals must accept it as conclusive, and assume that Kees is dead, and that he died at the time indicated by the testimony, when he was exposed to perils from which death might well have ensued.

The law provides, that if more than thirty days have elapsed between the making of a contract and the death of the party alleged to have been insane, the insanity cannot be shown, after his death, to invalidate that contract, unless interdiction shall have been applied for. R. C. C. article 1788, paragraph 5. Kees lived, and remained at home, more than six months after the making of the conveyances to the Meegels ; and no application was ever made for his interdiction. All inquiry as to his sanity is precluded, by the express terms of the law ; and it is now hushed in the silence of death.

The testimony tends to show that the Meegels took advantage of the mental condition of Kees ; and that they had not the means of paying in cash the price of their respective purchases. But the question is not whether, as between Kees, or the heirs of Kees, and the Meegels,

these conveyances were voidable for fraud and want of consideration. The real question is how the rights of Greve & Wilderman are affected, conceding, for the sake of the argument, that the fraud and want of consideration, as charged in the petition, have been fully proven.

The conveyances to the Meegels were well known to the family and neighbors of Kees, within a few days after their date. They were filed in the office of the parish recorder on the twenty-fourth April, 1863; but they were not actually recorded at that time, because by military order, the recording of transfers of property was prohibited. This prohibition was removed about January, 1865, and on the eighth of that month these conveyances were recorded without proof. On the 28th October, 1865, they were authenticated; and they were again recorded on that day. On their face they are valid in form; they disclose no defects in the title which they purport to convey; and they acknowledge the receipt of the price by Kees. The Meegels were certainly in possession, after the disappearance of Kees; and their recorded titles gave notice that they claimed to be the owners.

Five years after the date of these titles, three years after they had been inscribed in the public records of the parish, Fritz Meegel died; and in the mortuary proceedings, apparently regular, his half of the property was sold at public sale, and purchased by Edward Meegel; and the conveyance to him by the curator was duly recorded on the 21st December, 1868.

Reference has been made in the argument, to a suit brought by Toups, against Edward Meegel, in May, 1872, to recover two arpents front on the upper line of the nine arpents conveyed to Fritz Meegel by Kees. Of course, this suit can have no bearing on the question of the good faith of Greve & Wilderman, in accepting the mortgages of 1869, and 1871, not only because of the date at which it was brought but because the only question passed upon in that suit was that of priority of title. Toups claimed under a notarial title from Bourgeois, duly recorded, in 1872; and Bourgeois acquired from Kees, by notarial title, duly recorded in 1856. When Kees sold nine arpents to Fritz Meegel he sold two arpents which did not belong to him; and when Edward Meegel purchased, at the probate sale, he did not acquire these two arpents; and this court so decided, at the February term, 1876. 28 An. 111.

It was proven that Digher told Greve, one of the defendants, that the title of the Meegels was not good, that everybody looked upon it as a fraud; but he does not fix the date of this communication otherwise than that it was three or four years before the sale under the mortgages; and he says that Greve made him no answer.

It was also proven that Mr. Blake, who was attorney for Edward Meegel in 1869, was the attorney for Greve & Wilderman in the execu-

tory proceedings. The argument is that, as Blake must have known the defects in Meegel's title, when the mortgages were granted, Greve & Wilderman, who became his clients in 1875, are to be charged with notice. Surely counsel cannot be serious in urging this; but if it had been proven that Mr. Blake, in 1875, when he was employed by Greve & Wilderman to enforce their mortgage rights, had told them that the title of Edward Meegel was bad, their good faith as mortgagees would not have been thereby impaired. There in nothing in the record to impugn the good faith of Greve & Wilderman as mortgagees; and it cannot be seriously questioned.

It is well settled that the holder of the legal title, which is properly inscribed in the public records, whether it be simulated or fraudulent, conveys a good title to the purchaser in good faith. There can be no difference, in principle, between the good faith of the purchaser, and the good faith of the mortgagee, so far as their respective rights are concerned; and jurisprudence makes none. In Foster vs. Foster, 11 La. 401, Thomas Foster conveyed 18 slaves to his brother Levi, fraudulently and without consideration. Some months after this title had been recorded, Levi Foster mortgaged the slaves, for his antecedent debt. Both the Fosters died; and the representatives of Thomas brought suit against the representatives of Levi, to recover the slaves, on the ground of fraud and want of consideration. The mortgage creditors of Levi intervened, and asserted their rights. This court said, page 408:

"Had Levi Foster sold the slaves to a third person, ignorant of the nature of the sale from his brother, it cannot be doubted that the vendee's title would have been good. A mortgage is in the nature of an alienation; and the mortgage creditor, who had no knowledge of the fraud, would be equally protected with the vendee. No principle is better established in law or moral justice than that third persons, acting in good faith, shall not be prejudiced by the frauds of others, in which they have no agency or concern."

This doctrine was approved and affirmed, after elaborate argument, in Stockton vs. Craddick, 4 An. 283, which was also the case of a mortgage by a fraudulent vendee.

In Hunter vs. Buckner, 29 An. 604, the purchaser, Walmsley, who had not paid the price, although payment was acknowledged in the conveyance, mortgaged the property to Buckner who was in good faith; and Buckner proceeded *via executiva*. The vendors of Walmsley sued to arrest the sale, to annul the mortgage, and to recover the property for non-payment of the price. This court held that Buckner was not affected by any secret purposes or understanding between the original parties, not brought home to him. That the resolutory condition is, indeed, implied in all commutative contracts; and its effect is to restore

the status that existed at the date of the contract; but, "the act of sale informs the world that the price was paid; and Buckner, acting on that information, gave credit to the owner of the property, and is entitled to enforce his mortgage rights upon it."

The mortgagee in good faith, acquires the right to have the mortgaged property sold in satisfaction of the mortgage debt; and if he cannot do this, the mortgage is of no value. Subsequent notice or knowledge of defects in the title of the mortgagor, can no more impair the right of the mortgagee to seize and sell the mortgaged property, than could the right of the purchaser in good faith, to hold and enjoy the property, be affected by subsequent notice or knowledge of the fraud or simulation in the title of his vendor. The contrary doctrine would strip real estate and mortgages of their value; and would leave the rights of innocent third persons, dealing on the faith of public recorded titles, in a deplorable state of uncertainty and insecurity. The good faith which the law requires is that which existed at the time of contracting; and the vendee and the mortgagee are equally protected in their respective rights by this good faith.

Of course Mrs. Meegel could not have been expected to make any attack on the title of her husband; but there was no obstacle to the operation, by Mrs. Davis, of her rights as one of the forced heirs of her father. The title was never called in question, judicially, until 1872, nine years after its date, and after the disappearance of Kees, four years after the death of Fritz, and three years after Greve & Wilderman had acquired their rights as mortgagees. Their good faith protects the title which they subsequently acquired, in the enforcement of their mortgage rights, as effectually as it protected those rights, *ab origine*.

The judgment appealed from is, therefore, annulled, avoided, and reversed; and the demand of plaintiffs, appellees, is rejected, and their suit dismissed, with costs in both courts.

Rehearing refused.